Filed 5/25/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE ex rel. KAMALA HARRIS, as Attorney General, etc., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> DELTA AIR LINES, INC., <br><br> Defendant and Respondent. | A139238 <br><br> (City & County of San Francisco Super. Ct. No. CGC12526741) |

In this appeal we hold that this lawsuit filed by the People, on behalf of the State of California (the State), under the unfair competition law (Bus. & Prof. Code § 17200 et. seq. (UCL)[1]), against Delta Air Lines, Inc. (Delta) is expressly preempted by the Airline Deregulation Act of 1978 (49 U.S.C. § 41713 (b)(1)) (ADA). By its complaint, the State seeks injunctive and monetary damages based on an allegation that Delta's Fly Delta mobile application is in violation of the privacy policy requirements mandated by California's Online Privacy Protection Act of 2003 (Bus. & Prof. Code, §§ 22575-22579; Stats. 2003, ch. 829, § 1). Agreeing with Delta that the State's lawsuit was expressly preempted by the ADA, the superior court dismissed the complaint with prejudice after sustaining Delta's demurrer without leave to amend.[2] We affirm.

---

[1]    Because the Legislature has not given Business and Professions Code sections 17200 et seq. an official name, our Supreme Court refers to these sections as the "unfair competition law." (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 169, fn. 2.) In this opinion, we refer to these statutory sections in the same manner.

[2]    We treat the superior court's May 9, 2013, order sustaining the demurrer without leave to amend and dismissing the complaint with prejudice as a final judgment of

1

# FACTUAL AND PROCEDURAL BACKGROUND[3]

## A.    California's Online Privacy Protection Act of 2003

In 2003, the Legislature added sections 22575 through 22579 to the Business and Professions Code, known as the Online Privacy Protection Act of 2003 (OPPA), to address the obligations of an operator of a commercial Web site or online service regarding the posting of a privacy policy on the Internet.  (Stats. 2003, ch. 829, § 1.)  The Legislature found and declared all of the following:  [¶] "(a) Each operator of a commercial Web site or online service has an obligation to post privacy policies that inform consumers who are located in California of the Web site's or online service's information practices with regard to the consumers' personally identifiable information and to abide by those policies.  [¶] (b) It is the intent of the Legislature to require each operator of a commercial Web site or online service to provide individual consumers residing in California who use or visit the commercial Web site or online service with notice of its privacy policies, thus improving the knowledge these individuals have as to whether personally identifiable information obtained by the commercial Web site through the Internet may be disclosed, sold, or shared.  [¶] (c) It is the intent of the Legislature that Internet service providers or similar entities shall have no obligations under this act related to personally identifiable information that they transmit or store at the request of third parties." (Stats. 2003, ch. 829, § 2.)

" The Senate Rules Committee's third reading analysis of [the OPPA] indicated that this legislation was necessary because '[e]xisting law does not directly regulate the privacy practices of online business entities.'  (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 68 (2003-2004 Reg. Sess.) as amended

---

dismissal from which an appeal lies.  (See Code Civ. Proc., § 581d; *Daar v. Yellow Cab Co.* (1967) 67 Cal.2d 695, 699 [" 'an order of dismissal is to be treated as a judgment for the purposes of taking an appeal when it finally disposes of the particular action and prevents further proceedings as effectually as would any formal judgment' "].)

[3]    Because the State's action was resolved by demurrer, we set forth the facts as alleged in the complaint, the operative pleading.  (*Shvarts v. Budget Group, Inc.* (2000) 81 Cal.App.4th 1153, 1156.)

Sept. 3, 2003, p. 2.)  The bill's author explained that because 'many consumers refuse to do business online because they have little protection against abuse,' online retailers should be required at least to disclose in their online privacy policies what personal information may be collected and how it is used.  (Assem. Com. on Business and Professions, Analysis of Assem. Bill No. 68 (2003-2004 Reg. Sess.) as amended Apr. 28, 2003, p. 2; see Assem. Com. on Judiciary, Analysis of Assem. Bill No. 68 (2003–2004 Reg. Sess.) as amended Apr. 2, 2003, p. 3 [' "Any policy will do.  The bill simply requires that an operator have a policy and then follow it." '].)  According to the bill's author, this disclosure regime would 'provide[] meaningful privacy protection[] that will help foster the continued growth of the Internet economy.'  (Assem. Com. on Business and Professions, Analysis of Assem. Bill No. 68 (2003–2004 Reg. Sess.) as amended Apr. 28, 2003, p. 2.)" (*Apple Inc. v. Superior Court* (2013) 56 Cal.4th 128, 148.)

Since its enactment in 2003, the OPPA has been amended three times. (Stats. 2004, ch. 183, § 21; Stats. 2004, ch. 865, § 32; and Stats. 2013, ch. 390, § 1.)  The statute currently contains detailed requirements addressing the drafting of a privacy policy and the posting of the privacy policy on an Internet website or online services. (Bus. & Prof. Code, §§ 22575, 22576, 22578, subds. (a), (b).) In pertinent part, Business & Professions Code section 22575, reads:  "(a) An operator of a commercial Web site or online service that collects personally identifiable information through the Internet about individual consumers residing in California who use or visit its commercial Web site or online service shall conspicuously post its privacy policy . . . . [¶] (b) The privacy policy required by subdivision (a) shall do all of the following:  [¶] (1) Identify the categories of personally identifiable information that the operator collects through the Web site or online service about individual consumers who use or visit its commercial Web site or online service and the categories of third-party persons or entities with whom the operator may share that personally identifiable information. [¶] (2) If the operator maintains a process for an individual consumer who uses or visits its commercial Web site or online service to review and request changes to any of his or her personally

3

identifiable information that is collected through the Web site or online service, provide a description of that process. [¶] (3) Describe the process by which the operator notifies consumers who use or visit its commercial Web site or online service of material changes to the operator's privacy policy for that Web site or online service. [¶] (4) Identify its effective date. [¶] (5) Describe how the operator responds to Web browser 'do not track' signals or other mechanisms that provide consumers the ability to exercise choice regarding the collection of personally identifiable information about an individual consumer's online activities over time and across third-party Web sites or online services, if the operator engages in that collection. [¶] (6) Disclose whether other parties may collect personally identifiable information about an individual consumer's online activities over time and across different Web sites when a consumer uses the operator's Web site or service. [¶] (7) An operator may satisfy the requirement of paragraph (5) by providing a clear and conspicuous hyperlink in the operator's privacy policy to an online location containing a description, including the effects, of any program or protocol the operator follows that offers the consumer that choice."  Additionally, Business & Professions Code section 22577 defines certain terms used in the statute in the following manner:  "(a) The term 'personally identifiable information' means individually identifiable information about an individual consumer collected online by the operator from that individual and maintained by the operator in an accessible form, including any of the following:  [¶] (1) A first and last name. [¶] (2) A home or other physical address, including street name and name of a city or town. [¶] (3) An e-mail address. [¶] (4) A telephone number. [¶] (5) A social security number. [¶] (6) Any other identifier that permits the physical or online contacting of a specific individual. [¶] (7) Information concerning a user that the Web site or online service collects online from the user and maintains in personally identifiable form in combination with an identifier described in this subdivision. [¶] (b) The term 'conspicuously posted' with respect to a privacy policy shall include posting the privacy policy through any of the following:  [¶] (1) A Web page on which the actual privacy policy is posted if the Web page is the homepage or first significant page after entering the Web site. [¶] (2) An icon that hyperlinks to a Web

4

page on which the actual privacy policy is posted, if the icon is located on the homepage or the first significant page after entering the Web site, and if the icon contains the word 'privacy.' The icon shall also use a color that contrasts with the background color of the Web page or is otherwise distinguishable. [¶] (3) A text link that hyperlinks to a Web page on which the actual privacy policy is posted, if the text link is located on the homepage or first significant page after entering the Web site, and if the text link does one of the following: [¶] (A) Includes the word 'privacy.' [¶] (B) Is written in capital letters equal to or greater in size than the surrounding text. [¶] (C) Is written in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from the surrounding text of the same size by symbols or other marks that call attention to the language. [¶] (4) Any other functional hyperlink that is so displayed that a reasonable person would notice it. [¶] (5) In the case of an online service, any other reasonably accessible means of making the privacy policy available for consumers of the online service." The OPPA further provides that an operator of an Internet website or online services is in violation of the requirement to conspicuously post its privacy policy "if the operator fails to post its policy within 30 days after being notified of noncompliance." (Bus. & Prof. Code, § 22575, subd. (a).) However, the OPPA itself does not provide for a private action or public prosecution for any violation of its provisions.

### B. Delta's Fly Delta Mobile Application

Delta is primarily an air carrier engaged in the business of providing passenger air transportation. To facilitate access to its services by consumers and potential consumers, Delta maintains a commercial website Delta.com accessible on the Internet. Since at least October 2010, Delta is also "an operator of online services," in the form of the Fly Delta mobile application, which can be downloaded from the Internet and runs on smart phones and other mobile devices. In its complaint, the State alleges that the Fly Delta mobile application "may be used to check-in online for an airplane flight, view reservations for air travel, rebook cancelled or missed flights, pay for checked baggage, track checked baggage, access a user's frequent flyer account, take photographs, and

5

even save a user's geo-location."[4] The Fly Delta mobile application also allegedly allows customers to send and receive information over the Internet, and collects certain personally identifiable information ("PII") about individual consumers residing in California.[5] However, as of the filing of the complaint, Delta had failed to post a readily accessible privacy policy concerning the PII collected from users of the Fly Delta mobile application – either in the Fly Delta mobile application itself, in the platform stores from which the mobile application could be downloaded, or on the Delta.com website.[6] Consequently, as of the filing of the complaint, the current version of the Fly Delta mobile application, released June 15, 2012 (on Google) and June 22, 2012 (on Apple), had been downloaded by consumers millions of time since October 2010 without the posted privacy policy required by the OPPA. And, thus, users of the Fly Delta mobile application were not informed that PII was collected concerning them, how Delta used that information, or to whom that information was shared, disclosed or sold.

---

[4] In opposing the demurrer, the State informed the superior court that since the filing of its complaint, Delta's Fly Delta mobile application allows customers to price and purchase tickets.

[5] In its complaint, the State alleges that the PII collected through the Fly Delta mobile application includes (a) geo-location data (GPS); (b) photographs; (c) user's full name; (d) street addresses (residential and billing); (e) telephone numbers (including cell, fax, and pager); (f) email addresses; (g) Delta Sky Miles account number and flight information; (h) credit/debit card numbers and expiration dates; (i) date of birth; (j) gender; (k) traveler number; (l) travel-related information, such as travel company, emergency contacts, seating preferences, medical needs and dietary requests; (m) passport number, nationality, country of residence; (n) corporate contract, employer or affiliation. In its brief on appeal, the State further asserts that at the time of the filing of its complaint, Delta's Fly Delta mobile application might have been collecting other PII, which was not disclosed in any privacy policy, including the collection of a universal device identification, which "uniquely and statically identifies the mobile device and user."

[6] According to the State, the Delta.com website contained a privacy policy describing some of the PII collected by the website, but the website's privacy policy did not mention the Fly Delta mobile application or disclose certain PII collected only by the Fly Delta mobile application, such as geo-location data or photographs.

By a letter dated October 26, 2012, the state Attorney General notified Delta that its Fly Delta mobile application did not comply with the requirements of the OPPA, and that violations of the OPPA were subject to enforcement under the UCL. Among other things, Delta was told that "[a] Web site or online service operator that collects personally identifiable information ('PII') and 'fails to post its [privacy] policy [that complies with statutory requirements] within 30 days after being notified of noncompliance' is in violation of" the OPPA. Delta was asked to respond within 30 days of the date of the letter with the following information: (1) Delta's specific plans and timeline to comply with the law; or (2) why Delta believed the Fly Delta mobile application was not covered by the law. On October 30, 2012, "several media sources reported that Delta had released a statement that said: 'We have received a letter from the Attorney General and intend to provide the requested information.' "

## C.    Superior Court Proceeding

On December 6, 2012, the State filed this lawsuit alleging that as of the filing of the complaint, "the Fly Delta [mobile application] on multiple platforms still does not have a privacy policy conspicuously posted, i.e., reasonably accessible to consumers within the [mobile application]." The complaint's sole cause of action alleged that Delta was in violation of the UCL by committing "unlawful, unfair, or fraudulent business acts and practices," including, but not limited to, the following: (a) Delta has continued to fail to conspicuously post a privacy policy in its Fly Delta mobile application, in violation of the OPPA, despite receiving written notice on or about October 26, 2012, from the Attorney General that the Fly Delta mobile application was noncompliant with Section 22575 of the OPPA, and "such unlawful failure to comply is made either (i) knowingly or willfully; or (ii) negligently and materially, pursuant to Section 22576;" and (b) Delta has further violated Section 22575 of the OPPA, "by failing to even comply with the website privacy policy posted on the Delta website, in that the Fly Delta application does not comply with the Delta website privacy policy, and "such unlawful failure to comply is made either (i) knowingly and willfully; or (ii) negligently and materially." In its prayer for relief, the State sought (1) $2,500 for each violation of the UCL, proved at trial, (2)

7

injunctive relief enjoining Delta from committing any acts of unfair competition, and (3) an award of costs of the lawsuit including attorney fees and investigation costs.

In lieu of an answer, Delta filed a demurrer, arguing, in pertinent part, that the plain terms of the ADA, and United States Supreme Court decisions interpreting the ADA's broad preemption provision, compelled the conclusion that the federal law expressly preempted the State's lawsuit. The State opposed the demurrer, arguing that the ADA did not preempt its lawsuit. Finding that the ADA expressly preempted the State's lawsuit, the superior court sustained Delta's demurrer without leave to amend and dismissed the complaint with prejudice. The State's timely appeal ensued. [7]

---

[7]    In addition to the briefs filed by the parties, we have considered an amicus curiae brief, in support of Delta's position, filed by Air Transport Association of America, Inc. doing business as Airlines For America.

Also, Delta requests that we take judicial notice of certain documents, which were not submitted in the superior court: (1) U.S. Senate Report No. 95-631, 2d Sess. regarding the ADA; (2) U.S. House of Representatives Report No. 95-1779, 2d Sess. (1978) (Conf. Report) regarding the ADA; (3) U.S. House of Representatives Report No. 98-793 (1984) regarding the ADA; (4) California Senate Committee of Judiciary, Analysis of Assem. Bill No. 68 analyzing the OPPA; (5) Statement of Interest of United States, filed in *National Fed. of the Blind v. United Airlines, Inc*. (N.D. Cal. 2011), 2011 U.S. Dist. Lexis 44366; (6) Brief for United States as amicus curiae supporting affirmance, filed in *National Fed. of the Blind v. United Airlines, Inc.* (9th Cir. 2016) 813 F.3d 718 (*National Fed. of the Blind*); (7) Brief for United States as amicus curiae supporting reversal, filed in *Northwest, Inc. v. Ginsberg* (2014) 572 U.S. __ [134 S.Ct. 1422]; (8) *Third-Party Enforcement Complaint of the Electronic Privacy Information Center Against Northwest Airlines, Inc.* ([Department of Transportation] 9/10/04) [2004 WL 2049588]); (9) July 14, 2000, Letter from Samuel Podberesky, Assistant General Counsel for "Aviation Enforcement and Proceeding" of the U.S. Department of Commerce to John Mogg at the European Commission in Belgium, explaining the role of the Department of Transportation in protecting the privacy of consumers with respect to information provided by them to airlines. We deferred consideration of Delta's request for judicial notice to the decision on appeal, and we now deny the request for judicial notice. "Generally, ' "when reviewing the correctness of a [superior] court's judgment, an appellate court will consider only matters which were part of the record at the time the judgment was entered." [Citation.]' [Citations.]" (*California School Bds. Assn. v. State of California* (2011) 192 Cal.App.4th 770, 803.) Delta has "not cited any exceptional circumstances that would justify a deviation from this rule in this appeal." (*Ibid.*) In all events, as to the legislative reports related to the enactment of the ADA and the OPPA, a

8

## DISCUSSION

### I. Standard of Review

"We apply a de novo standard of review because this case was resolved on demurrer (*McCall v. PacifiCare of Cal., Inc.* (2001) 25 Cal.4th 412, 415 [106 Cal.Rptr.2d 271, 21 P.3d 1189]) and because federal preemption presents a pure question of law (*Spielholz v. Superior Court* (2001) 86 Cal.App.4th 1366, 1371 [104 Cal.Rptr.2d 197])." (*Farm Raised Salmon Cases* (2008) 42 Cal.4th 1077, 1089, fn. 10.) "A judgment of dismissal after a demurrer has been sustained without leave to amend will be affirmed if proper on any grounds stated in the demurrer, whether or not the [superior] court acted on that ground." (*Carman v. Alvord* (1982) 31 Cal.3d 318, 324.) [8]

### II. Federal Preemption Principles

" 'The Supremacy clause of the United States Constitution establishes a constitutional choice-of-law rule, makes federal law paramount, and vests Congress with the power to preempt state law.' (*Viva! Internat. Voice for Animals v. Adidas Promotional Retail Operations, Inc.* (2007) 41 Cal.4th 929, 935 [63 Cal.Rptr.3d 50, 162 P.3d 569]; see U.S. Const., art. VI, cl. 2; *Cipollone v. Liggett Group, Inc*. (1992) 505 U.S. 504, 516 [120 L.Ed.2d 407, 112 S.Ct. 2608].) Congress may exercise that power by enacting an express preemption provision, or courts may infer preemption under one or

request for judicial notice of those materials is not necessary. "Citation to the material is sufficient." (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 45, fn. 9; *Wittenberg v. Beachwalk Homeowners Assn*. (2013) 217 Cal.App.4th 654, 665, fn. 4 ["[a] motion for judicial notice of published legislative history, such as the Senate Analysis here, is unnecessary"].) Consideration of the other described material is not necessary to the resolution of this appeal. (See *Jordache Enterprises, Inc. v. Brobeck, Phleger & Harrison* (1998) 18 Cal.4th 739, 748, fn. 6 [court declined to take judicial notice of materials that were not "necessary . . ."].)

[8] Consequently, we do not separately address the superior court's reasons for sustaining the demurrer without leave to amend. (*McKell v. Washington Mutual, Inc*. (2006) 142 Cal.App.4th 1457, 1470 [to the extent the superior court's ruling may have been in error, "[w]e need not make the determination as to whether there was error" because our review is de novo and we "make our own determination as to whether plaintiff[ ] [has] pleaded facts sufficient to constitute a cause of action, under any theory"].)

more of three implied preemption doctrines: conflict, obstacle, or field preemption. (See *In re Jose C.* (2009) 45 Cal.4th 534, 550 [87 Cal.Rptr.3d 674, 198 P.3d 1087].)" (*Brown v. Mortensen* (2011) 51 Cal.4th 1052, 1059 (*Brown*).)

Also, "[t]he United States Supreme Court has identified 'two cornerstones' of federal preemption analysis. (*Wyeth v. Levine* (2009) 555 U.S. 555, 565 [173 L.Ed.2d 51, 129 S.Ct. 1187, 1194][(*Wyeth*)].) First, the question of preemption ' "fundamentally is a question of congressional intent." ' (*In re Tobacco Cases II* (2007) 41 Cal.4th 1257, 1265 [63 Cal.Rptr.3d 418, 163 P.3d 106], quoting *English v. General Electric Co.* (1990) 496 U.S. 72, 79 [110 L.Ed.2d 65, 110 S.Ct. 2270] [(*English*)]; see also *Wyeth*, 555 U.S. at p. 565 [129 S.Ct. at p. 1194] [' "[T]he purpose of Congress is the ultimate touchstone in every pre-emption case." '].) If a statute 'contains an express pre-emption clause, our "task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." ' (*Sprietsma v. Mercury Marine* (2002) 537 U.S. 51, 62-63 [154 L.Ed.2d 466, 123 S.Ct. 518]; see also *Viva! Internat. Voice for Animals v. Adidas Promotional Retail Operations, Inc., supra*, 41 Cal.4th at p. 939.)" (*Brown, supra*, 51 Cal.4th at pp. 1059-1060.) "[W]hen Congress has made its intent known through explicit statutory language, the courts' task is an easy one." (*English, supra*, 496 U.S. at p. 79.) There is also a second rule that may be relevant to an analysis in preemption cases, namely, " ' " 'the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' " ' [Citations.]" (*Brown, supra*, 51 Cal.4th at p. 1060.) This is known as the presumption against preemption, and its application " 'provides assurance that "the federal-state balance" [citation] will not be disturbed unintentionally by Congress or unnecessarily by the courts.' [Citation.]" (*Olszewski v. Scripps Health* (2003) 30 Cal.4th 798, 815.)

## III.   The ADA Preemption Provision (49 U.S.C. § 41713(b)(1))

"Prior to 1978, the Federal Aviation Act of 1958 (FAA) [(72 Stats. 731, as amended, 49 U.S.C. App. § 1301 et. seq.)], gave the Civil Aeronautics Board (CAB) authority to regulate interstate airfares and to take administrative action against certain

deceptive trade practices. It did not, however, expressly pre-empt state regulation, and contained a 'savings clause' providing that 'nothing . . . in this chapter shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies.' [(49 U.S.C. App. § 1506 [now 49 U.S.C. § 40120(c)].)] As a result, the States were able to regulate intrastate airfares (including those offered by interstate air carriers) [(see, e.g., *California v. CAB* (1978) 189 U.S. App. D.C. 176, 178, 581 F.2d 954, 956, cert. denied (1979) 439 U.S. 1068)], and to enforce their own laws against deceptive trade practices. [(See *Nader v. Allegheny Airlines, Inc.* (1976) 426 U.S. 290, 300.)]" (*Morales v. Trans World Airlines, Inc.* (1992) 504 U.S. 374, 378 (*Morales*).)

"In 1978, however, Congress, determining that 'maximum reliance on competitive market forces' would best further 'efficiency, innovation, and low prices' as well as 'variety [and] quality . . . of air transportation services,' enacted the Airline Deregulation Act (ADA). [(49 U.S.C. App. §§ 1302(a)(4), 1302(a)(9) [now 49 U.S.C. §§ 40101(a)(6), (12)(A)].)] To ensure that the States would not undo federal deregulation with regulation of their own, the ADA included a pre-emption provision, prohibiting the States from enforcing any law 'relating to rates, routes, or services' of any air carrier. [(49 U.S.C. App. § 1305(a)(1) [now 49 U.S.C. § 41713(b)(1)].)]" (*Morales, supra*, 504 U.S. at pp. 378-379.) "In its current form, this provision states that 'a State, political subdivision of a State, or political authority of at least 2 States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart.' [(49 U.S.C.] § 41713(b)(1).)]" [9] (*Northwest, Inc. v. Ginsberg, supra,* 134 S.Ct. at p. 1428

---

[9] The clause formerly read in relevant part: "No State . . . shall enact or enforce any law, rule, regulation, standard or other provision having the force and effect of law relating to rates, routes, or services of any air carrier . . . ." (49 U.S.C. App. § 1305(a)(1).) When Congress reenacted Title 49 of the U.S. Code in 1994, it revised the clause to read as it is stated in the text of this opinion. "Congress intended the revision to make no substantive change. [(Pub. L. 103-272, § 1(a), 108 Stats. 745.)]" (*American Airlines, Inc. v. Wolens* (1995) 513 U.S. 219, 223, fn. 1 (*Wolens*).)

(*Ginsberg*).) "The ADA retained the CAB's previous enforcement authority regarding deceptive trade practices (which was transferred to the Department of Transportation (DOT) when the CAB was abolished in 1985), and it also did not repeal or alter the saving clause in the prior law." (*Morales, supra*, 504 U.S. at p. 379.)

The United States Supreme Court has addressed the reach of the ADA's preemption provision in three cases: *Morales, supra*, 504 U.S. 374; *Wolens, supra*, 513 U.S. 219; and *Ginsberg, supra*, 134 S.Ct. 1422.

"In 1992, in *Morales*, [the high court] confronted detailed Travel Industry Enforcement Guidelines, composed by the National Association of Attorneys General (NAAG). The NAAG guidelines purported to govern, *inter alia*, the content and format of airline fare advertising. [(See *Morales, supra*, 504 U.S. at pp. 393-418 [appendix to Court's opinion setting out NAAG guidelines on air travel industry advertising and marketing practices].)] Several States had endeavored to enforce the NAAG guidelines, under the States' general consumer protection laws, to stop allegedly deceptive airline advertisements. The States' initiative, [the high court] determined, 'related to [airline] [prices], routes, or services,' [(*Morales, supra*, at pp. 378-379)]; consequently, [the high court] held, the fare advertising provisions of the NAAG guidelines were preempted by the ADA [(*Morales, supra*, at p. 379).]" (*Wolens, supra*, 513 U.S. at p. 223.) *Morales*, in pertinent part, broadly defined the "relating to" language in the ADA preemption clause as "having a connection with, or reference to, airline '[prices], routes, or services,' " even if the state law did not directly regulate those activities. (*Morales, supra*, 504 U.S. at pp. 384, 386; see also *Rowe v. New Hampshire Motor Transp. Assn.* (2008) 552 U.S. 364, 370-371 (*Rowe*), quoting with approval *Morales, supra*, at pp. 384, 386.) But, as later explained by the high court, in *Wolens*, "[t]he *Morales* opinion presented much more, however, in accounting for the ADA's preemption of the state regulation in question. The opinion pointed out that the concerned federal agencies – the Department of Transportation (DOT) and the Federal Trade Commission (FTC) – objected to the NAAG fare advertising guidelines as inconsistent with the ADA's deregulatory purpose; both agencies, *Morales* observed, regarded the guidelines as state regulatory measures

preempted by the ADA. [Citations.] *Morales* emphasized that the challenged guidelines set 'binding requirements as to how airline tickets may be marketed,' and 'imposed [obligations that] would have a significant impact upon . . . the fares [airlines] charge.' [Citation.] The opinion further noted that the airlines would not have '*carte blanche* to lie or deceive consumers,' for 'the DOT retains the power to prohibit advertisements which in its opinion do not further competitive pricing.' [Citation.] *Morales* also left room for state actions 'too tenuous, remote, or peripheral . . . to have pre-emptive effect.' [Citation.]" (*Wolens, supra*, 513 U.S. at p. 224, fn. omitted.)

In 1995, in *Wolens, supra*, 513 U.S. 219, the high court again considered the application of the ADA preemption clause to a claim concerning an airline's frequent flyer program. (*Wolens, supra*, at p. 222.) The Illinois Supreme Court had held that the ADA did not prohibit American Airlines' (American's) frequent flyer program members from pursuing a claim for money damages based on an allegation that the airline's retroactive modification of the program's benefits violated Illinois' Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act or Act). (*Wolens, supra*, at pp. 222, 225, 226.) "Describing frequent flyer programs as not 'essential,' but merely 'peripheral to the operation of an airline,' . . . the Illinois court typed plaintiffs' state-law claims . . . as 'related to American's [prices,] routes, and services' only 'tangentially' or 'tenuously' . . . ." (*Id.* at p. 226.) The high court reversed, and held that "the ADA's preemption prescription bars state-imposed regulation of air carriers . . . ." (*Wolens, supra*, at p. 222.) In so ruling, the high court initially addressed the Illinois Supreme Court's decision in the following manner: "We need not dwell on the question whether plaintiffs' complaints state claims 'relating to [air carrier] [prices,], routes, or services.' *Morales*, we are satisfied, does not countenance the Illinois Supreme Court's separation of matters 'essential' from matters unessential to airline operations. Plaintiffs' claims relate to '[prices],' i.e., American's charges in the form of mileage credits for free tickets and upgrades, and to 'services,' i.e., access to flights and class-of-service upgrades unlimited by retrospectively applied capacity controls and blackout dates." (*Wolens, supra*, at p. 226.) As to the issue of whether plaintiffs' claims under the Illinois

13

Consumer Fraud Act were preempted, the high court explained: "The Illinois Consumer Fraud Act declares unlawful [¶] '[u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act" . . . in the conduct of any trade or commerce . . . whether any person has in fact been misled, deceived or damaged thereby.' [Citation.] [¶] The Act is prescriptive; it controls the primary conduct of those falling within its governance. This Illinois law, in fact, is paradigmatic of the consumer protection legislation underpinning the NAAG guidelines. The NAAG Task Force on the Air Travel Industry, on which the Attorneys General of California, Illinois, Texas, and Washington served [citation], reported that the guidelines created no [¶] 'new laws or regulations regarding the advertising practices or other business practices of the airline industry. They merely explain in detail how existing state laws apply to air fare advertising and frequent flyer programs.' [Citation.] [¶] The NAAG guidelines highlight the potential for intrusive regulation of airline business practices inherent in state consumer protection legislation typified by the Consumer Fraud Act. For example, the guidelines enforcing the legislation instruct airlines on language appropriate to reserve rights to alter frequent flyer programs, and they include transition rules for the fair institution of capacity controls. [Citation.] [¶] As the NAAG guidelines illustrate, the Consumer Fraud Act serves as a means to guide and police the marketing practices of the airlines; the Act does not simply give effect to bargains offered by the airlines and accepted by airline customers. In light of the full text of the preemption clause, and of the ADA's purpose to leave largely to the airlines themselves, and not at all to States, the selection and design of marketing mechanisms appropriate to the furnishing of air transportation services, [the Court] conclude[d] that [the ADA] preempts plaintiffs'

14

claims under the Illinois Consumer Fraud Act."[10] (*Wolens, supra*, at pp. 227-228, fn. omitted; see also *Rowe, supra*, 552 U.S. at p. 371, citing with approval *Wolens, supra*, at pp. 226-228.)

And, in *Ginsberg, supra*, 134 S.Ct. 1422, the high court again considered the reach of the ADA's preemption provision to a claim based on an airline's alleged violation of its frequent flyer program. (*Id*. at pp. 1426-1427.) In that case, the plaintiff filed a class action on behalf of himself and all other similarly situated members of Northwest's frequent flyer program, alleging, among other things, that the airline had breached its implied covenant of good faith and fair dealing when it terminated the plaintiff's membership in its frequent flyer program. (*Id*. at p. 1427.) The trial court determined that the breach of implied covenant claim was preempted because it "related to" Northwest's rates and services and thus fell within the ADA's preemption provision. (*Ginsberg, supra*, at p. 1427.) On appeal, "[t]he Ninth Circuit Court of Appeal reversed. [Citation.] Relying on pre-*Wolens* Circuit precedent, the Ninth Circuit first held that a breach of implied covenant claim is 'too tenuously connected to airline regulation to trigger preemption under the ADA.' [Citation.] Such a claim, the Ninth Circuit wrote, 'does not interfere with the [ADA's] deregulatory mandate' and does not ' "force the Airlines to adopt or change their prices, routes, or services – the prerequisite for preemption." ' [Citation.] In addition, the [Ninth Circuit] held that the covenant of good faith and fair dealing does not fall within the terms of the [ADA's] pre-emption provision because it does not have a 'direct effect' on either 'prices' or 'services.' [Citation.]" (*Ginsberg, supra*, at p. 1428.) The high court reversed. It found that under the circumstances presented, the breach of implied covenant claim was preempted by the ADA. (*Ginsburg, supra*, at pp. 1429-1433.) Reaffirming *Morales*' broad interpretation of the ADA preemption provision (*id.* at pp. 1428-1429, 1430), the high court concluded

---

[10] In a footnote, the high court stated: "We note again, however, that the DOT retains authority to investigate unfair and deceptive practices and unfair methods of competition by airlines, and may order an airline to cease and desist from such practices or methods of competition. [Citations.]" (*Wolens, supra*, at p. 228, fn. 4.)

that the breach of implied covenant claim " 'relate[d] to' '[prices], routes, or services.' " (*Id*. at pp. 1430-1431.) The high court stated: "A claim satisfies this requirement if it has 'a connection with, or reference to, airline' prices, routes, or services [(*Morales, supra*, 504 U.S. at p. 384)], and the claim at issue here clearly has such a connection. That claim seeks [the plaintiff's] reinstatement in Northwest's frequent flyer program so that he can access the program's 'valuable . . . benefits,' including 'flight upgrades, accumulated mileage, loyalty program status or benefits on other airlines, and other advantages.' [Citation.] [¶] Like the frequent flyer program in *Wolens*, the Northwest program is connected to the airline's 'rates' because the program awards mileage credits that can be redeemed for tickets and upgrades. [Citation.] When miles are used in this way, the rate that a customer pays, i.e., the price of a particular ticket is either eliminated or reduced. The program is also connected to 'services,' i.e., access to flights and to higher service categories. [Citation.]" (*Ginsberg, supra*, at pp. 1430-1431.) The high court further noted that its ruling did not "leave participants in frequent flyer programs without protection. The ADA is based on the view that the best interests of airline passengers are most effectively promoted, in the main, by allowing the free market to operate. If an airline acquires a reputation for mistreating the participants in a frequent flyer program (who are generally the airline's most loyal and valuable customers), customers can avoid that program and may be able to enroll in a more favorable rival program. [¶] Federal law also provides protection for frequent flyer program participants. Congress has given the Department of Transportation (DOT) the general authority to prohibit and punish unfair and deceptive practices in air transportation and in the sale of air transportation [(49 U.S.C. § 41712(a))], and Congress has specifically authorized the DOT to investigate complaints relating to frequent flyer programs. [(See FAA Modernization and Reform Act of 2012, § 408(6),126 Stats. 87.)] Pursuant to these provisions, the DOT regularly entertains and acts on such complaints." (*Ginsberg, supra*, at p. 1433, fn. omitted.)[11]

---

[11] Congress has also specifically authorized the DOT to investigate consumer

16

Having described our high court's pertinent decisions in this area of law, we now discuss whether the ADA preemption provision bars state enforcement of the OPPA as applied to Delta's Fly Delta mobile application.

## IV. The ADA as Applied to the State's Lawsuit to Enforce the OPPA Against Delta

Preliminary to our analysis, we address several issues that have been conclusively disposed of by *Morales* and *Wolens*.

We agree with the Attorney General that in determining whether the ADA preempts this UCL action, we examine the underlying state law predicate for the UCL action – the OPPA. "*Morales* calls for an analysis of the underlying state regulations to see if they relate to [an air carrier's] prices, routes, or services when enforced through the UCL." (*People ex rel. Harris v. Pac Anchor Transportation, Inc.* (2014) 59 Cal.4th 772, 784-785, cert. denied (2015) __ U.S.__ [135 S.Ct. 1400] (*Pac Anchor Transportation*); see *Morales, supra*, 504 U.S. at pp. 388-390.)[12]

However, we reject the Attorney General's argument that in our analysis, we are required to presume Congress did not intend to preempt the OPPA. "[T]he presumption against preemption 'only arises . . . if Congress legislates in a field traditionally occupied by the states.' [Citation]. In matters of air transportation, the federal presence is both longstanding and pervasive; that field is simply not one traditionally reserved to the states. The Supreme Court has not suggested that the presumption against preemption should be interposed in that field, nor has the [high court] been hesitant to give force to the ADA preemption provision." (*Brown v. United Airlines, Inc.* (1st Cir. 2013) 720 F.3d 60, 68; see *DiFiore v. American Airlines, Inc.* (1st Cir. 2011) 646 F.3d 81, 86 (*DiFiore*); *Buck v. American Airlines, Inc.* (1st Cir. 2007) 476 F.3d 29, 34-35 (*Buck*).) Our

---

complaints about deceptive or misleading advertising. (See FAA Modernization and Reform Act of 2012, § 408(7), 126 Stats. 87.)

[12] As noted, the OPPA does not explicitly provide for a private action or public prosecution for any violation of its provisions. In the absence of any arguments on the matter, we assume for the purposes of this appeal that a violation of the OPPA may be enforced through an UCL action.

conclusion is supported by *Morales* and *Wolens*, in which the high court has not "adopted [the Attorney General's] position in this case that we should presume strongly against preempting in areas historically occupied by state law." (*DiFiore, supra,* 646 F.3d at p. 86; *Buck, supra*, 476 F.3d. at p. 34.)  Instead, in resolving the scope of the ADA's preemption provision, the high court's analyses in those cases centered on the impact that the challenged state law would have on airline prices and services, " ' "and not on the fact that the preempted laws were enacted pursuant to the states' police power to combat consumer fraud." ' " (*De Jesus v. American Airlines, Inc*. (D. Puerto Rico 2007) 532 F.Supp.2d 345, 350 (*De Jesus*); see *Wolens, supra,* 513 U.S. at p. 222 ["the ADA's preemption prescription bars state-imposed regulation of air carriers . . ."]; *Morales, supra*, 504 U.S. at pp. 387-390 [ADA's preemption prescription bars state enforcement of NAAG fare advertising guidelines under the states' general consumer protection laws].)

We also reject the Attorney General's argument that the complaint does not relate to Delta's services.  By its complaint, the State seeks to compel Delta to maintain its Fly Delta mobile application in compliance with the OPPA's privacy policy requirements. The Fly Delta mobile application, selected and designed to facilitate access to the airline's services, is a marketing mechanism "appropriate to the furnishing of air transportation services." (*Wolens, supra*, at p. 228.)  As alleged in the complaint, the Fly Delta mobile application, at a minimum, "may be used to check-in online for an airplane flight, view reservations for air travel, rebook cancelled or missed flights, pay for checked baggage, track checked baggage, and access a user's frequent flyer account." Thus, it is clear, beyond cavil, that the complaint does "relate to" Delta's services in that the allegations have a "connection with, or reference to" Delta's services. [13]

---

[13]     In so concluding, we need not and do not address the Attorney General's assertion that the Fly Delta mobile application is not a "service" within the meaning of the ADA. We recognize that the federal circuit courts of appeals have read the word "services" in the ADA preemption provision in various ways. (Compare *Hodges v. Delta Airlines, Inc*. (5th Cir. 1995) 44 F.3d 334, 336 [en banc] (defining "service" more broadly in terms of the " '[contractual] features of air transportation,' " including " 'ticketing, boarding procedures, provision of food and drink, and baggage handling' "), with *Charas v. Trans*

18

We additionally find no merit to the Attorney General's assertions that (1) the OPPA is a law of general applicability, which does not reference or coercively regulate Delta's services, and (2) Delta is not required to offer a mobile application in order to conduct its business, and therefore, the OPPA applies to Delta only because Delta "*chooses* to provide a mobile application that is subject to" the OPPA. (Italics in original.) Again, the high court has disposed of these arguments in *Morales* and *Wolens*. Rejecting the argument "that only state laws specifically addressed to the airline industry are pre-empted, whereas the ADA imposes no constraints on laws of general applicability," *Morales* explained: "Besides creating an utterly irrational loophole (there is little reason why state impairment of the federal scheme should be deemed acceptable so long as it is effected by the particularized application of a general statute), this notion . . . ignores the sweep of the 'relating to' language." (*Morales, supra*, 504 U.S. at p. 386.) The high court has also made it clear that ADA preemption does not turn on whether the state law is related to a matter "essential," as opposed to a matter that is unessential, to airline operations. (*Wolens, supra*, 513 U.S. at p. 226.)

We now turn to the issue before us, namely, whether the complaint under the OPPA is preempted by the ADA. "In light of the full text of the preemption clause, and of the ADA's purpose to leave largely to the airlines themselves, and not at all to the States, the selection and design of marketing mechanisms appropriate to the furnishing of

*World Airlines, Inc.* (9th Cir. 1998) 160 F.3d 1259, 1261 [en banc] (defining "service" more narrowly to "the prices, schedules, origins and destinations of the point-to-point transportation of passengers, cargo, or mail," but not to "include an airline's provision of in-flight beverages, personal assistance to passengers, the handling of luggage, and similar amenities"); *National Fed. of the Blind, supra,* 813 F.3d at pp. 725-729 [accord].) However, "[w]e are . . . not bound by the decisions of federal courts other than the United States Supreme Court (*People v. Gray* (2005) 37 Cal.4th 168, 226), although their interpretation of federal law may be persuasive (*Spellman v. Securities, Annuities & Ins. Services, Inc*. (1992) 8 Cal.App.4th 452, 459)." (*Teva Pharmaceuticals USA, Inc. v. Superior Court* (2013) 217 Cal.App.4th 96, 109, fn. 2.) In all events, the issue before us is not whether the Fly Delta application is a "service," but whether it "relates to" Delta's services. As *Morales* explains, the Attorney General's assertion "[s]imply reads the words 'relating to' out of the statute." (*Morales*, *supra,* 504 U.S. at p. 385.)

19

air transportation services" (*Wolens, supra*, 513 U.S. at p. 228), we conclude the ADA preempts the State's claim under the OPPA as applied to Delta's operation of its Fly Delta mobile application.

In arguing against federal preemption, the Attorney General asserts the OPPA is merely a "disclosure regime," in that "*other than some baseline requirements*," the OPPA gives the operator of online services "broad discretion as to what to say and where to 'conspicuously post' the policy;" " '[a]ny policy will do. The [law] simply requires that an operator have a policy and then follow it.' " However, the Attorney General's argument does not fully capture the scope of the compliance mechanism under the OPPA. The State, through the OPPA, seeks to mandate Delta's compliance with the "baseline requirements" of the statute as applied to its Fly Delta mobile application. The law, among other things, requires operators of online services to draft a privacy policy describing their collection of certain categories of "personally identifiable information," and to provide for a "reasonably accessible means of making the privacy policy available for consumers of the online service." (Bus. & Prof. Code, § 22575, subds. (a), (b)(7).) Thus, similar to the NAAG guidelines in *Morales* and the Illinois Consumer Fraud Act in *Wolens*, the OPPA "is prescriptive; it controls the primary conduct of those falling within its governance." (*Wolens, supra*, 513 U.S. at p. 227.) It "serves as a means to guide and police the marketing practices of the airline[ ];"the [OPPA] does not simply give effect to bargains offered by the airline[ ] and accepted by airline customers," as the Attorney General suggests. (*Wolens, supra*, 513 U.S. at p. 228.) "This [California] law, in fact, is paradigmatic of the consumer protection legislation underpinning the NAAG guidelines [and the Illinois Consumer Fraud Act]," and "highlight[s] the potential for intrusive regulation of airline business practices inherent in state consumer protection legislation . . . ." (*Wolens, supra*, at pp. 227-228.)

More significantly, like the obligations imposed by the NAAG guidelines, "[a]ll, in all, the obligations imposed by the [OPPA] would have a significant impact upon the airline['s] ability to market [its] product [through its Fly Delta mobile application], and hence a significant impact upon the fares they charge." (*Morales, supra*, 504 U.S. at

p. 390.)  If each State were to require Delta to comply with its own version of the OPPA, it would force Delta to design different mobile applications to meet the requirements of each state.  And, indeed, enforcement of the OPPA's privacy policy requirements might well make it impossible for an airline to use a mobile application as a marketing mechanism at all.  (*Morales, supra*, at pp. 389-390.)  Thus, "to interpret the [ADA] preemption provision not to reach [the OPPA] 'could easily lead to a patchwork of state service-determining laws, rules, and regulations,' which would be " 'inconsistent with Congress'[s] major legislative effort to leave such decisions, where federally unregulated, to the competitive marketplace.' " (*Air Transport Assn. of America, Inc. v. Cuomo* (2d Cir. 2008) 520 F.3d 218, 223 (per curiam); see *Wolens, supra*, 513 U.S. at pp. 228, 230 [" 'Congress could hardly have intended to allow the States to hobble [competition for airline passengers] through the application of restrictive state laws;' " "the ADA . . . was designed to promote 'maximum reliance on competitive market forces' "].)

We also reject the Attorney General's argument that the OPPA does not run afoul of the ADA because it would have at best a peripheral effect on ticket prices, routes, or airline services.  "When the [high court] invoked the rubric ('tenuous, remote, or peripheral'), it used as examples limitations on gambling, prostitution [and obscenity] . . . — state regulation comparatively remote to the transportation function." (*DiFiore, supra*, 646 F.3d at p. 89, citing to *Morales, supra*, 504 U.S. at p. 390.)  Because the OPPA would require Delta to meet state standards regarding privacy policy requirements in place of the market forces currently dictating Delta's selection and design of its Fly Delta mobile application, the effect of the OPPA would not be "tenuous, remote or peripheral." (*Morales, supra*, at p. 390.)  Nor are we persuaded by the Attorney General's assertion that the cost to Delta to comply with the OPPA would be minimal because within a day of the State filing its complaint Delta was able to post a privacy policy for the Fly Delta mobile application.  (See *Bower v. Egyptair Airlines Co*. (1st Cir.

21

2013) 731 F.3d 85, 96, cert. denied (2014) ___ U.S. __ [134 S.Ct. 1788]["the ADA preempts laws regulating the operations of airlines 'whether at high cost or low' "].) [14]

We conclude our discussion by noting that we do not write on an entirely clean slate. Several federal district courts have considered the scope of ADA preemption in the context of state enforcement of consumer protection laws similar to the UCL for an air carrier's violation of its privacy policy regarding the collection of PII. All the courts have reached the same conclusion we reach here today – the ADA preempts state-law

---

[14] As the high court has noted on each occasion that it has addressed the reach of the ADA preemption provision, "the DOT retains authority to investigate unfair and deceptive practices and unfair methods of competition by airlines, and may order an airline to cease and desist from such practices or methods of competition. [Citations.]" (*Wolens, supra*, 513 U.S. at p. 228; see *Morales, supra*, 504 U.S. at p. 379; *Ginsberg, supra*, 134 S. Ct. at p. 1433.) "Pursuant to this exclusive authority, the DOT created an Office of Consumer Protection, a unit of Office of the Aviation Enforcement and Proceedings, responsible [for] compliance with the DOT's consumer protection requirements also in charge of detecting and correcting any practices by carriers that are inimical to the consumer interest. This office receives informal complaints from members of the public regarding aviation consumer issues, such as deceptive advertisement practices." (*De Jesus, supra,* 532 F.Supp.2d at p. 354.) And, DOT has apparently taken action regarding air carriers' collection of PII and privacy policies for the sharing and storage of PII. (See, e.g., 78 Fed. Reg. 26101-03 (May 3, 2013 [Notice of 4th Meeting of DOT Advisory Committee for Aviation Consumer Protection scheduled for May 21, 2013, to receive comments regarding, among other things, what privacy policies are in place concerning personally identifiable information collected in connection with the purchase of air travel, whether information is used consistent with those policies, and what security measures are in place to protect against unauthorized access]; see also Order to Show Cause issued by the DOT, served May 21, 2014, at pp. 2, 13 [DOT seeks comments on its proposed approval of an agreement adopting a new Resolution 787 (Enhanced Airline Distribution), which establishes a process for developing a technical standard for data exchange in the air transportation marketplace using extensible markup language (XML), "the modern language of the internet"; DOT's approval was conditioned on the airlines continuing to following their privacy policies for the sharing and storage of personal information as the "[f]ailure by an entity to follow its established privacy policy for the sharing and storing of personal information is a violation of 49 U.S.C. § 41712, the statute prohibiting unfair and deceptive practices"].) In all events, the fact that DOT has not issued any regulations concerning the form and placement of privacy policies related to an airline's mobile application does not allow the State to exercise its reserved Constitutional and police powers to do so, as the Attorney General suggests.

22

claims seeking to enforce air carriers' privacy policies through consumer protection laws similar to the UCL. (See *In re JetBlue Airways Corp. Privacy Litigation* (E.D.N.Y. 2005) 379 F.Supp.2d 299 (*JetBlue Airways*); *In re American Airlines, Inc., Privacy Litigation* (N.D. Tex. 2005) 370 F.Supp.2d 552 (*American Airlines*); *Copeland v. Northwest Airlines Corp.* (W.D. Tenn. 2005) 2005 U.S. Dist. Lexis 35139 (*Copeland*); *In re Northwest Airlines Privacy Litigation* (D. Minn. 2004) 2004 U.S. Dist. Lexis 10580 (*Northwest Airlines*).) In these cases, the plaintiffs claimed to have been injured by an airline's unauthorized collection and disclosure of certain of their PII in their passenger name records (PNRs) in violation of the airline's stated privacy policies concerning the sharing of PII. (*JetBlue Airways, supra*, at pp. 303, 304, 305; *American Airlines*, *supra*, at p. 554; *Copeland, supra*, at pp. *2-3; *Northwest Airlines, supra*, at p. *3.) The plaintiffs alleged the airlines' conduct constituted deceptive trade practices under the Texas Deceptive Trade Practices-Consumer Protection Act, the New York General Business Law, the Minnesota Deceptive Trade Practices Act, the Tennessee Consumer Protection Act, and similar statutes of 45 other states and the District of Columbia, which prohibit unfair and deceptive acts and practices. (*JetBlue Airways, supra*, at pp. 305, 315, fn. 12; *American Airlines, supra*, at p. 555; *Copeland, supra*, at p. *9, fn. 3; *Northwest Airlines, supra*, at p. *3.) The federal district courts uniformly concluded that the plaintiffs' claims were expressly preempted by the ADA under *Morales* and *Wolens*. (*JetBlue Airways, supra*, at pp. 315-316 ; *American Airlines, supra*, at p. 555; *Copeland, supra*, at pp. *9-10; *Northwest Airlines, supra*, at pp.* 10-12.) As the federal district court in *JetBlue Airways* explained, the plaintiffs' claim concerning a violation of the airline's privacy policy "fits squarely within the range of state law actions that the Supreme Court concluded, in *Wolens* and *Morales*, are expressly preempted by the ADA, because it represents a direct effort to regulate the manner in which [the airline] communicates with its customers in connection with reservations and ticket sales, both of which are services provided by the airline to its customers." (*JetBlue Airways, supra*, at p. 315.) And, as further explained by another federal district court, and pertinent to our discussion, "Congress surely intended to immunize airlines from a host of potentially-

23

varying state laws and state-law causes of action that could effectively dictate how [air lines] manage personal information collected from customers to facilitate the ticketing and reservation functions that are integral to the operation of a commercial airline." (*American Airlines, supra*, at p. 564, fn. omitted). We find these decisions both persuasive and dispositive of the federal preemption issue in this case. [15]

We therefore hold that state enforcement of the OPPA's privacy policy requirements as applied to Delta's Fly Delta mobile application is expressly preempted by the ADA. To compel Delta to comply with the OPPA would effectively interfere with the airline's "selection and design" of its mobile application, a marketing mechanism "appropriate to the furnishing of air transportation service," for which state enforcement

---

[15] The Attorney General's reliance on the United States Supreme Court's decision in *Dan's City Used Cars, Inc. v. Pelkey* (2013) 569 U.S.__ [133 S.Ct. 1769] (*Pelkey*), is misplaced. At issue in that case was the preemption provision of the Federal Aviation Administration Authorization Act of 1994 (FAAAA), which generally precludes any State from enacting or enforcing a law "related to a price, route, or service of any motor carrier . . . *with respect to the transportation of property*." (49 U.S.C. § 14501(c)(1); italics added.) As explained by the high court, "[a]lthough [49 U.S.C.] § 14501(c)(1) otherwise tracks the ADA's air-carrier preemption provision [(*Rowe, supra*, 552 U.S. at p. 370)], the FAAAA formulation contains one conspicuous alteration — the addition of the words 'with respect to the transportation of property.' That phrase 'massively limits the scope of preemption' ordered by the FAAAA. [Citation.] [Thus,] . . . for purposes of FAAAA preemption, it is not sufficient that a state law relates to the 'price, route, or service' of a motor carrier in any capacity; the law must also concern a motor carrier's 'transportation of property.' [Citation.]" (*Pelkey, supra,* 133 S.Ct. at pp. 1778-1779.)

The Attorney General also requests that we consider certain cases that have been decided since the briefs were filed in this matter. However, these cases, like *Pelkey*, are inapposite as they also concern the scope of the FAAAA's preemption provision (49 U.S.C. § 41501(c)(1)) as applied to state enforcement of labor and employment laws against motor carriers. (See *Dilts v. Penske Logistics LLC* (9th Cir. 2014) 769 F.3d 637, 647, cert. denied (2015) __ U.S.__ [135 S.Ct. 2049]; *Pac Anchor Transportation, supra,* 59 Cal.4th at p. 783; *Godfrey v. Oakland Port Services* (2014) 230 Cal.App.4th 1267, 1279-1283, cert. denied (2015) __ U.S. __ [136 S.Ct. 318].) Here, we are concerned with whether the ADA (49 U.S.C. § 41713(b)(1)) preempts state enforcement of the OPPA, which law we have concluded is "paradigmatic of the consumer protection legislation" at issue in *Morales* and *Wolens.* (*Wolens, supra*, 513 U.S. at pp. 227-228.)

has been held to be expressly preempted by the ADA.  (*Wolens, supra*, 513 U.S. at p. 219; see *Morales, supra*, 504 U.S. at pp. 387- 390.) [16]

<hr />

[16] We recognize that "[b]oth *Morales* and *Wolens* relied on doctrine developed under [the Employee Retirement Income Security Act of 1974 (ERISA) [29 U.S.C. § 1144(a)]], and at the time the [high court's] opinions tended to read the ERISA language broadly. [(See, e.g., *Morales, supra*, 504 U.S. at pp. 383-384, relying on *Shaw v. Delta Air Lines, Inc.* (1983) 463 U.S. 85.)] . . .  More recent decisions hold that state laws of general applicability are not preempted just because they have economic effects on pension or welfare plans. [(See, e.g., *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.* (1995) 514 U.S. 645; *California Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc.* (1997) 519 U.S. 316, 319, 325, 330-331 (*Dillingham*); *De Buono v. NYSA–ILA Medical and Clinical Services Fund* (1997) 520 U.S. 806 (*De Buono*).)] . . .  But if developments in pension law have undercut holdings in air-transportation law, it is for the [United States] Supreme Court itself to make the adjustment.  [We must] follow decisions until the [United States] Supreme Court overrules them.  [(*State Oil Co. v. Khan* (1997) 522 U.S. 3, 20 [it is the high court's "prerogative alone to overrule one of its precedents"]; *Rodriguez de Quijas v. Shearson/American Express, Inc.* (1989) 490 U.S. 477, 484 ["[i]f a precedent of [the high court] has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to [the high court] the prerogative of overruling its own decisions"].)] (*United Airlines, Inc. v. Mesa Airlines, Inc.* (7th Cir. 2000) 219 F.3d 605, 608 (*Mesa Airlines*); see *Boon Ins. Agency v. American Airlines, Inc.* (Tex. App. 2000) 17 S.W.3d 52, 57, fn. 5 [the federal appellate court adheres to the high court's discussion of the ADA's preemption provision in *Morales* and *Wolens* and declines to extrapolate the later ERISA cases into speculation that the high court's holdings in *Morales* and *Wolens* would be different today].)  "[A]nd we doubt that [the Attorney General's] position could be justified by the latest ERISA cases, even if we were free (which we are not) to prefer decisions such as *De Buono* and *Dillingham* over *Wolens* and *Morales*."  (*Mesa Airlines, supra,* 219 F.3d at p. 609.)  The Attorney General's reliance on cases that hold state law is preempted by the ADA only if the law "binds the carrier to a particular price, route, or service and thereby interferes with competitive market forces within the air carrier industry," cannot be reconciled with *Morales* (NAAG guidelines detailing how existing state laws applied to air fare advertising and frequent flyer programs held preempted), *Wolens* (Illinois Consumer Fraud Act held preempted) or *Ginsberg* (common-law claim of implied breach of covenant of good faith and fair dealing held preempted), which are "a long distance from" state laws or regulations binding a carrier to a particular price, route, or service, and, thereby, interfering with competitive market forces within the air carrier industry.  (*Mesa Airlines, supra,* 219 F.3d at p. 609.)

25

## V.    State's Request for Leave to Amend

When a demurrer is sustained without leave to amend, " 'we decide whether there is a reasonable possibility that the defect can be cured by amendment; if it can be, the [superior] court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff.' [Citations.]" (*Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1126.) As we have concluded, the allegations as currently set out in the complaint are not sufficient to impose liability on Delta under existing statutes or case law. The Attorney General argues, however, that the complaint can be amended to delete any reference to the collection of passenger ticketing information, and to retain allegations of the collection of non-ticketing PII data (geo-locational information and photographs) and to add allegations of any additional PII data collected by the Fly Delta mobile application, which was not disclosed in any privacy policy since the filing of the complaint. We disagree. As explained by the high court, "the ADA's purpose . . . leave[s] largely to the airlines themselves, and not at all to States, *the selection and design of marketing mechanisms* appropriate to the furnishing of air transportation services." (*Wolens, supra*, 513 U.S. at p. 228; italics added.) If we permit the State to amend its complaint in the manner described, such an amendment would not eliminate the ADA's express preemptive effect on the State's enforcement of the OPPA against Delta. Consequently, we deny leave to amend the complaint.

## VI.    Conclusion

In sum, we conclude the State's lawsuit against Delta based on allegations of violations of the OPPA is expressly preempted by the ADA. Because we also conclude there is no reasonable possibility that the complaint can be amended to avoid the preclusive effect of federal preemption, we must uphold the dismissal for failure to state a claim for relief.

26

## DISPOSITION

The order filed on May 9, 2013, is affirmed.  Delta Air Lines, Inc. is awarded costs on appeal.

_____
Jenkins, J.

We concur:


_____
McGuiness, P. J.


_____
Pollak, J.

Trial Court:                          Superior Court, City and County of San Francisco

Trial Judge:                          Hon. Marla J. Miller

Counsel for Appellant:                Kamala D. Harris, Attorney General
State of California                   Dane R. Gillette, Chief Assistant Attorney General
                                      Robert Morgester, Senior Assistant Attorney General
                                      Adam Miller, Supervising Deputy Attorney General
                                      Stacey D. Schesser, Supervising Deputy Attorney
                                      General, California Department of Justice

Counsel for Respondent:               David J. Schindler
Delta Airlines, Inc.                  Jennifer C. Archie *(pro hac vice admitted)*
                                      Drew R. Wisniewski *(pro hac vice admitted)*
                                      LATHAM & WATKINS, LLP

Amicus Curiae For Respondent          Robert S. Span
Delta Airlines, Inc.:                 STEINBRECHER & SPAN LLP
   Air Transport Association of
   America, Inc., doing business
   as Airlines for America